15-1839, In Re NuVasive, Inc., and again, Mr. Rosado. Thank you, and may it please the Court. There's a fair amount of overlap between issues, between what we just discussed in these cases, so I will try to avoid repeating myself on some issues and instead focus on some of the But we don't have anything about lateral in these. Well, we do, Your Honor. In the 356 patent case, it specifically recites the same type of lateral transoas. The system's claim, right? It's a system claim, so there is a claim construction issue there, and it ties more directly into the rationale to combine issues, so the two tie together. But as an initial matter, it's worth pointing out that in the context of construing the Here, the Board never offered any construction for what lateral transoas meant. The only thing that it stated about claim construction is that that term is a statement of intended use and entitled to no weight other than defining the system and its components as being suitable for that type of use. Capable. Or capable of, yeah, capable for that type of use, and we generally agree with that. But there are consequences that flow from that construction. That include, at least, one, why a person of ordinary skill would put these components and prior references together in that manner if it's not for the stated intended use in the claim. What is the purpose? And then two, this capable of use for, that is an aspect for rationale that is completely unaddressed in both the petition and the Board's final written decision. So the two rationale issues tie together. There's a broader issue for rationale that traces throughout the cases, and that ties to the fundamental misapprehension of the references upon which the petitions were constructed. What I mean is the Obenchain reference was assumed to be a lateral approach going through the nerve-rich region of the psoas. The stated rationale was you would want nerve monitoring to navigate through that. Now, that's wrong for two reasons. One, the state there at the time taught that that nerve-rich region was perceived as a- Can I just stop? Because I guess it seemed to me that you're, just tell me why this is, why I've missed something about the way you've conceived of your case. Right at the core of your case on these system claims is the proposition that nobody would have been sufficiently motivated to put the electrical sensing on the inserted devices unless they were planning to go through the nerve-rich region of the psoas. And it seemed to me that the Board cited, and the director in the Green Brief in support of the Board cited still more, evidence that that's just not true. There were other motivations to make that combination, and if you make the combination and all you have is a capability reference to use, then you're there. So why is the director wrong in saying the Board found wholly independent of Obenchain based on, I don't know, was it Marino, Kelleher, a few different things, there was motivation to put the electrical sensing on the insertion devices, let's call them. Sure. So, first, as patent under any of these proceedings, our initial task is responding to the petitioner's stated case and addressing whether they met the burden of proof. So here the petitioner is specifically advanced as their rationale, that rationale being to traverse through the nerve-rich region. So in addressing that stated rationale and the only stated rationale, it was demonstrated that one, that is not an accurate reflection of the stated error at the time, the state of the art reviewed that area of the body as not an area that could safely or predictably be traversed without any of the technology that was available at the time. So that was the stated error on that issue. As for any alter, oh, and then the other point on that is their interpretation of Obenchain, that was the reference that the petitioner is pointing to as the reference teaching the surgical path. So they're saying, follow the surgical path of Obenchain, it leads you through here. So responding to that is demonstrating that their case was built on a false premise. So that's one response. Putting Obenchain aside though, as Judge Toronto said, I mean, Kelleher and Marino are pretty powerful references because they say, you know, any, this is useful for any surgery because there's always nerves and especially if you're going at the spine and they don't say whether you're going at the spine through the stomach or through the back or through the side. They say, anytime you're going at the spine, you need to be worried about nerves. So just because some regions are more nerve rich than others, doesn't mean that it's not teaching that you would use this device. Yeah. So again, two responses, one coming back to the stated rationale and two, that characterization, which I think you accurately recited the board's characterization, I would just take issue with that actual characterization. I would like to get into that, but the stated rationale. I know I accurately characterized the board, but I actually read the references and that's what they said. Well, they don't say anything about the psoas muscle and the board. They'd say anytime you're going toward the spine, there's going to be lots of nerves. They say any, when you're going toward the spine and you're traversing tissues that include lots of nerves, but that is true in some approaches to the spine and not others, especially when you're talking about motor neurons and even when you're getting into the psoas muscle, there's undisputed point made and evidence to support it, that even in the psoas muscle, the anterior portion lacked the sensitive motor neurons that were being traced and of a concern. There's a Morrow paper in the record, and I can find you the A site, that maps the neural anatomy of the psoas muscle and specifically characterizes the anterior portion as a safe zone that's where nerve damage is not of concern. So that's what the psoas muscle, what the anterior approach, again, these are the access issues that come up and drive these types of surgeries. An anterior approach has access issues. Those issues relate entirely to organs, blood vessels, bowels, have nothing to do with nerves. So nerves are not a, they are not, I mean, anytime you're dealing with the spine, you've got a spinal cord, but in terms of the access, excuse me, nerve monitoring is not, is not used in, in anterior approaches. There are, you know, there are blood vessels you have to watch out for, you have to be careful bowel perforation and so forth, but it, you know, a nerve monitoring is not something that is a concern. But, but that's not what the reference, I mean, yes, it's possible that some surgeons don't do belt and suspenders in certain types of surgery, but, but the, but the reference teaches that it would be useful for anytime you're going near the spine just to be safe. When going through nerves having sensitive tissues, and every one of the, the citations that the board provides to, you know, Blewett, for example, Blewett refers to tissues having nerves, which, which if impinged could cause damage. The Kelleher reference has similar statements and the, the remaining one, what is it, the Marino? Yeah, Marino. Well, and Marino is a great example, right? I'm not, I'm sorry, I'm not following you, I mean, the, the, the patent shows going through at least part of the psoas, right, and there are nerves in there, and so why isn't the board correct that to do that you would want to do nerve monitoring? When you say the patent, are you referring to the open chain patent? Your patent. Oh, yes, our patent certainly teaches that, but if the board is relying on that, obviously that's improper hindsight. Now, as far as the state... No, but it's teaching, but it's teaching is going through at least part of the psoas muscle, and if, if that's what you're going to do, you would use nerve monitoring, wouldn't you? According to our patent, yes, it's in terms of rationale to combine the prior reference... On Marino, wouldn't Marino teach you to do that? To go through the psoas? No, to, to, if you were going to go through part of the psoas, to use nerve monitoring. It absolutely would not teach you that. Think about the Marino, because the Marino device, first, it says nothing about the psoas muscle. Two, the way the device is constructed, in no way is it possible to use that device in navigating the psoas. Marino has an, you know, an expandable pedal distal tip that's designed to, when you contact a nerve, mobilize it out of the way. The psoas, one of the unique aspects of the psoas muscle is those nerves aren't easily mobilized, and they have to be navigated through. So how a person would be able to use that expandable tip without completely shredding the psoas muscle, I have no idea. But that's something, I mean, these are the things that aren't explained, and that gets to the capable of issue, and that issue traces throughout, both with, you know, the nerve monitoring references like Marino, but also the retractor systems like KOROS, right? KOROS is a retractor system having large flanged blades to hold organs out of the way. How you would advance that through the psoas muscle without completely destroying it is not apparent or explained anywhere. So there is this, you know, rationale issue, with patentable weight, and a lack of explanation how these things get there. There's really just, there's a claim mapping, but it's a rationale that's... Can I just ask, for purposes of this question, just assume for a minute that Marino and Kelleher motivated a relevant skilled artisan to put the electrical sensing equipment on a system of, you know, nested dilators, cannulas. Did you have evidence that if that structure were created, it would not be capable of a trans-psoas approach? No, but I would say that's not the patent owner's burden to do that, Your Honor. And we were criticized by the board on that basis. But in the context of rationale... Did Kronik have evidence that once you had that, you know, electrified dilator system, it would be capable of a trans-psoas approach? Let's assume now it was, you know, a lateral transfer for one of these two cases. So for particularly the dilators, I think the extent of their argument was these are all in the same art, and this is analogous art, and you could have done this. Where I think they're showing and the board's is particularly lacking is when it comes to the retractor systems. There is absolutely no description of what modifications would need to be made, how those would be done, and why somebody would do that. Right? Again, this is... You know, I do want to... You know, I've got three minutes. I do... If I may, I want to answer your question, but I do want to hit the objective evidence, which are very important throughout all of these cases. But it ties into, you know, some of these very same considerations we're talking about for motivation. You know, you can do what the board did, which is go find the elements and ask why not. There is one. We shouldn't be in a position of really having to answer that without being the party without the burden of proof, but the objective indicia, that is the type of evidence that's supposed to address that type of, you know, why not question. And... Are you contending that the XLIF procedure is the invention that is disclosed in the patents? It is, without dispute, an embodiment in every single one of the claims of the four different patents. But, I mean, how can that be if at times that procedure doesn't include cannulated devices with no monitoring? XLIF... So, the core components of the XLIF system are a trans-hose approach using stimulated dilate... Sequential dilators stimulated with a corresponding retractor system over it. Those are all core components of all of the claims. So, and again, this was not a point of dispute, neither Medtronic nor the board ever dispute that XLIF fell within the scope of the claims. And this is one of the fundamental issues, gating issues and errors for the board's treatment of the secondary considerations. This court has explained, even as recently as the PPC broadband case, PPC... There are two of them, the PPC Corningware, that once there... When evidence of objective initiative is tied to a commercial product, and that product is demonstrated to fall within the scope of the claim, there's a presumption of nexus, right? Well, that's a fine principle, but the problem is that it's difficult to understand whether this procedure really does fall within the scope of the claims. Well, Medtronic never had any difficulty and they never... Well, I don't care if they have difficulty. I'm having difficulty, so let's talk about that. Well, the board had difficulty some instances and they didn't have difficulty in other instances when they addressed the initia for its knockdown value. And the board's entire response was essentially to go find unclaimed features and point out that those are not expressly recited. So again, if everything that's uncontested is taken, what we're left with is the commercial embodiment falling within the scope and nothing of rebuttal beyond saying that there are aspects of the system that aren't expressly recited, but nobody was contesting that it fell within the scope. I know there is a surgical guide that was presented just to briefly address this point. There was a declaration that was submitted, there was argument in the response discussing the essential components of the system, how they map to the claims. There's Dr. Phillips' declaration where he included a claim chart mapping all the aspects of XLIF from the XLIF surgical guide, which is a step-by-step surgical guide with pictures and illustrations to the claims. Medtronic's expert... You're well over your time here. We'll give you two minutes for rebuttal. Thank you. Mr. Craven? Thank you, Your Honor. May it please the court. Starting with the motivation to combine, there is plenty of evidence in Medtronic's petition there, expert and the board found in the prior art references, a motivation to combine cannulated instruments with nerve monitoring, and particularly these claim dilating cannulated instruments. And regardless of a trans-OS approach to the spine, there was also then evidence presented that there was a motivation to use this in a trans-OS approach, not just overchain, but because Medtronic's expert testified that a direct lateral approach or a lateral approach to the spine is the most direct approach. So unless there's any questions about that, I will move on then to the capable of question. There seems to be some argument in their brief that there's not evidence that these instruments are capable of going through a direct lateral approach to the spine. There was no... They never presented any of this evidence to the board, and the board found there's no evidence that it wouldn't be capable of the direct lateral approach. What about on the affirmative side of the ledger? So I don't... I don't think there's any evidence on Medtronic's side that they were or were not. There was just... There would be a motivation to combine in the general... I think a general... Right, but if the claim is construed to require capability, then need not there be affirmative evidence that that requirement is met, namely that there was such capability? I think they said that it was capable of, but they didn't say... I'm sorry, who said? Medtronic. Sorry. Medtronic said it was... They construed the claim as an intended use for the lateral trans oas approach, and that there was a motivation to combine these particular instruments and they would be capable of going through the direct lateral approach. Where's the capability evidence, though? So I think... I don't think it was... Is it just an argument that Medtronic... It was just an argument, but then... Why is that enough, if they have the burden of proof? Well they were... Had the burden of proof that all these... They had the motivation to combine it and it would be capable, and they didn't... Nuvasiv didn't make any argument that it wasn't capable. Wait, wait, wait. The petitioner has the burden of proof. That's right. And as the Supreme Court said, if the petitioner falls out, then the board has the burden of proof on this issue, on this particular type of issue. So where is the affirmative evidence of capability? You can't just say, well, I construed that as a capability phrase and not have any evidence, affirmative evidence of the capability. I think that there was... The evidence was essentially that all these references talk about generally using it to... For lumbar spinal surgery, the minimally invasive instruments and the nerve monitoring, and that it would be capable then of any of those approaches. I don't know what more they could have... What particular evidence they could have said beyond, you know, when we combine these instruments... Was there expert testimony? There was expert testimony. There would be of a motivation to combine these and to use them in a direct lateral approach. There wasn't any particular testimony about, in order to do the specific trans-OS, you would need to make any different modification. And there's nothing in their patent that suggests there's some specific structure about these dilating cannulas and neuromodulation that require a different physical form than if you would use it in any other approach to the spine. What evidence are you referring to specifically about motivation to use these, you know, electrified dilators in a direct lateral approach? So let's see. Which appendix are we looking at? So I'm in the 1839 appendix. And this is Watkins' testimony. There's testimony at 1204, A1204, about combining them, combining specifically, this was the And I don't think the evidence was any different for these system claims than the method claims. I mean, it was talking about a motivation to combine tellers using their neuromodulation. Right. I mean, I guess I just want to focus on this because it's at least possible to view of the method claims, one of them, they didn't do a claim construction thing, so we can forget about the problem if there is one of lateral. The other one, there may be a problem of lateral. Now we're in the system claims. One of them has a lateral and the other one doesn't have a lateral, but they both have a capability, and so there has to be evidence. We didn't need to talk about it on the method, the two method patents. So I guess I really am interested in the specific evidence that when you create this apparatus, it is capable of being used. Maybe that's inferrable from you have a motivation to use it, but I guess I want to see what the evidence is. Okay. So let's go to A1198. This is a little earlier in Watkins' testimony, I mean, declaration. And it's at paragraph 37, and this is talking about the motivation to use the combination in a direct lateral transoas path. It's the most direct approach to the spinal disc in the anterior column of the spine, and it has advantages over the anterior and posterior approaches. So that was testimony that once you had a motivation to combine the particular instruments that you would be motivated to use it in a direct lateral approach. There wasn't any specific testimony or declaration statements about any particular structure that you would need to make this for the direct lateral approach as opposed to any different approach. And there's nothing in their patent that suggests that there needs to be a specific structure. And they didn't, and Nuvesis didn't present, didn't sort of contest the proposition, didn't say, well, even if you create this structure, that's not, and even if you assume this is a mere capability, you haven't shown that that capability exists with that structure. If I understand your question, Nuvesis didn't contest before the board that there was any particular structure that the motivation combined failed to meet, so that it wasn't capable of going through the direct lateral spine because the structure was X. They do have- The argument really appeared for the first time in their reply brief here, right? That's correct. They made a few statements in their blue brief that the retractors or things wouldn't work, but it's not until the reply brief before this court where they make attorney argument about how you wouldn't be able to modify these retractors to do the direct lateral approach as opposed to different approaches to the spine. So I think the argument is waived and I think that there's nothing beside, there's nothing, no testimony that was before the board or in the specification that they can point to that the combination of the prior wouldn't have been capable of doing the direct lateral approach. Let me ask you about the objective indicia. First of all, do you concede that to the extent that the board said that you can't show long felt need without showing failure of others, that that was error? To the degree that they were making a legal statement that failure of others required, that long felt need required failures of others, yes, that is incorrect. I don't think, I think that they were saying, that's not what I think they were saying. They were saying there's no evidence of a long felt need because there's all these other approaches and when they presented evidence, a patent by Jacobson of a long felt need for a lateral approach to the trans psoas muscle, there's nothing in that patent that says, thank goodness we've got this, we've needed this for a long time or someone needs to come up with this. All they had was, there were prior art statements, prior art patents that went through the lateral approach, didn't make a mention of the psoas muscle. The board reasonably... That was a loose statement that you would agree, at least on its face, appears incorrect, but you don't think it changed the validity of the analysis? That's right. I think it would be harmless error if they did make that incorrect legal statement. They did, when they made that site, they also then had a parenthetical from another case saying, just because there's a long time where no one's come up with this reference, isn't itself sufficient to show a long felt need. I think that's what they were getting at. You're not pointing to me to anything or anyone saying, we need this lateral approach as opposed to there's problems with the other approaches. And then in the absence of that, you haven't showed, there's nothing that shows this failure of others, which would indicate that someone was trying this. So I think it would be harmless error. What's your response to the XLIF? I understood that the board said there's just really insufficient evidence that it practices the claims. Your friend on the other side is saying, no, there really was no dispute that it practices the claims. So what's your response to that? The board said that that evidence first wasn't correctly incorporated into their response. The claim chart, everything was outside the brief and they didn't properly make the argument in their patent owner's response. The board also then went on to say that even if, despite the procedural infirmity, there's no evidence about what this Excel system is. If you look at what the expert was pointing to, there's this max access system. And then XLIF seems to be a subset of tools within then using these max access and neuromodulation systems to do the XLIF procedure. And so the board said, we're not exactly sure what this XLIF system is. And it appears that, in fact, to the extent you're saying there's all this praise and it looks like that's the max access system. That's where the dilating cannulators are and it's the neuromodulation system. And so it wasn't clear to them that what this XLIF system was and that there wasn't sort of a broader product of spine surgery systems, that the XLIF system was just one system in the max. I'm sorry, what evidence is there that this XLIF system is something other than the combination of the nested dilators and the electrical sensing put together? Their brochure has the XLIF system as a number of different instruments that are none of those. What else? What else is in there? We can look. Let's see. I don't think I have it marked in this. Oh, here it is. The max access system is, and with the different XLIF instruments, is it a 15,897. And that's where, so that's the instrument system and none of those, I mean, there's a number of different things, cords and sizers and maybe the distractor is what's used and is part of the claim, but in the next page, then you have the general instrument system and then it's not until you get to 15,901 where you're talking about the max access system that you have the dilators and the K wire and those aspects. I think what the board is saying is, it is disputed what these components are in terms of what they are as the XLIF system and when you refer to the XLIF system, what you are referring to. But beyond that, the board said, even if there's no presumption of nexus, these are clearly components of a larger system, so there should be no nexus of the success. And there was rebuttal evidence anyway in terms of... Can I ask you something about nexus? I'm not remembering precisely enough. I thought I was remembering, or I think I'm remembering, that the board said something like the following. You can't have nexus based on a use if there are a whole bunch of other uses. Use of a system and now a product and a thing as opposed to a series of steps. And I guess I started being troubled by that. Suppose you had a pharmaceutical composition, claim to the composition, and it's put out on the market for the one FDA cleared use that makes it extremely attractive and the rest is wild. That evidence surely counts as legitimate commercial success evidence on an obvious inquiry where there may be prior art that's really close, even though, as is also common, other uses of the very same molecule may be around. So I guess the idea that you can't establish nexus by pointing to one of a number of uses, seems, I don't know, overbroad. Can you help me on that? I think what... I hope this is helpful. I think what it is, is if that pharmaceutical composition and everyone says it's used for whatever it does is because of what is claimed, then we have no doubt that that's... It's the thing. It's the thing. But if the evidence... But why? Why? Because there are other uses that... Yeah. And I think that's fine that there are other uses. And to the extent the board was saying because there's other uses. I don't read the board saying that, but I think it's fine if it had other uses. If people's compliments or their praise and their success turned out because the drug is formulated with... I was just focusing. Yeah. I mean, it does seem to me that our little litany of secondary considerations maybe puts things in segregated boxes more than it should, but just focusing on commercial success. Turns out, as soon as this was available on the market, a whole lot of surgeons thought this is a good option to have, and a bunch of them started using it. And they knew that there were problems with the other approaches. Not ones that would lead you always to use this one, but in a lot of cases. That tells you there was an interest in achieving this ability, and if it were simple, obvious, it would have been done before. That's the kind of simple, logical relevance of evidence of this sort. So just on this commercial success, why can the board, if it did here, focus on the failure to discuss other possible uses when one use of this system turns out to have been of quite considerable interest in the medical community? I think to the extent there was a failure to discuss other uses, that's wrong. Because if there are other uses of it, that's fine. I think the nexus problem comes in, it's when the doctors are talking about, I use this, and it's so great, and I chose it, it's they're saying the neuromodulation system is direct, real-time, automated, our proprietary software. That's what they're praising, and that's not tied to the claim. So it's not that there's other uses that haven't been shown or looked at. It's that the praise that that product is getting is not then tied back to the claims, and that's, I think, the nexus problem that the board was focusing on. So it would have been fine if doctors were saying, this is amazing, we can now go through the trans-SOAS from any approach, and we've never been able to do that safely and effectively before. And it's just because of the neuromodulations with the dilating cannulas, but if they were saying it's because they have this new proprietary software, then that's the problem where the nexus is lost. I hope I've answered yours. I'm over my time. Thank you, Your Honor. Thank you. So on ExLIF, I just want to clarify something in the record. There was no fact-finding by the board that ExLIF did not fall within the scope of the claim. So there was no finding on that. Dr. Phillips submitted his... Well, there was a finding that they couldn't tell, right? There was a complaint that it wasn't easy enough for them to tell. I'm not clear that they went as far as to say they couldn't. I don't think they did. Actually, let me say that unequivocally. They did not find they were unable to determine that. They complained that this whole claim chart in Dr. Phillips' explanation, which by the way is evidence, not argument, was not bodily incorporated in the brief enough. And then they said, besides that, and they went on to commit legal errors as to why they weren't going to consider that. But there's no finding of fact that ExLIF didn't fall within the scope of the claim. That was described... It says, it appears from this evidence, and they just were listing all the discussion about neurovision and the MAC system. It says that ExLIF is a marketing term that's sometimes used to identify a surgical technique and other times used to identify groups of products, thus when patent owner uses the shorthand term ExLIF in its response, without clarifying argument, were unable to associate patent owner's objective evidence with particular products or features. I mean, that's a finding. That's pretty clear. That they're unable to associate, but that doesn't... Okay. I understand your point, Your Honor. Because this is one place where the patent owner does have a burden, and that is the burden to tie the evidence of commercial success to the claims. Okay. So then I would say, I appreciate that. If that's deemed a factual finding, the question is, is it one that's supported by substantial evidence? And it's not. There is a detailed explanation in Dr. Phillips' declaration. It's how this all maps together. Dr. Watkins, Medtronic's expert, filed a reply brief. He testified at A3758, paragraph seven, that he understood exactly what ExLIF was, and there was no dispute about ExLIF falling within the scope of the claim. So again, this goes back, and I agree with Ms. Craven when she says that the board's, the entirety of their nexus issue was a identification of unclaimed features. But going back to the PPC Broadband case, that's an erroneous application. Okay. I think we're out of time. Thank you, Mr. Rezano. Thank you. Thank both counsel. The cases are submitted. That concludes our session for this morning. All rise.